IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA      )
                            )
     v.                     )          CR. NO. 1:06cr011-MEF
                            )
TED DEWAYNE STEPHENS      )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This case is before the court on defendant Ted Dewayne Stephens' motion to suppress (Doc. #16). For the reasons that follow, the motion is due to be denied.

**Facts**

1.    <u>May 9, 2005 incident</u>

On May 9, 2005, Dothan, Alabama police officer Maurice Eggleston received a call from city dispatchers that someone was selling narcotics from a green Chevy Suburban behind a store called the Four-Way Stop.[1] Eggleston and his partner, Billy Joe Cochran, drove to the scene, parked about a block away, and walked to the store. There they found a teal Chevy Suburban that corresponded to the description of the vehicle. The defendant, who was seated on the passenger side of the vehicle, was the single occupant.

Eggleston approached the driver's side, while Cochran went to the passenger's side and made contact with defendant. Eggleston thought that he heard the doors lock as he approached. When he looked in the driver's side window, Eggleston saw defendant's left hand "fidgeting or moving around" the center console. Eggleston was concerned for his

---

[1] In the police report, the store is described as the "Four Stop Inn." Defendant's Exhibit 1.

safety since he could not see what the defendant was doing with his left hand, so he told Cochran to get the defendant out so they could talk to him outside the vehicle.[2]  Cochran told defendant to step out of the car, and Eggleston walked around to passenger's side.  However, defendant did not get out, and his hand stayed around the left side of the passenger seat where Eggleston could not see it.  Eggleston told defendant to get his hand away from his side.  When defendant did not do so, Eggleston reached across and grabbed the defendant's left forearm.  When Eggleston pulled up defendant's hand, he heard something drop.

Eggleston told Cochran to handcuff the defendant while he looked inside the vehicle. He found a loaded .38 caliber Smith & Wesson revolver near the side of the center console, just to the rear of the passenger's seat.  When Eggleston picked up the firearm, defendant said that it was his gun and he was scared so he dropped it, or words to that effect. According to the police report, defendant was charged with possession of a firearm without a permit.  In a search incident to that arrest, Eggleston found several pieces of crack cocaine in the center console, and defendant was also charged with unlawful possession of a controlled substance.

2.    August 5-6, 2005 incident

Just before midnight on August 5, 2005, Dothan, Alabama police officer Sean Malloy and two other officers were in the Dixie area of Dothan in an unmarked Chevy Blazer, observing activity at Southern Nights and Frank's Pool Hall, two clubs known for drug-

---

[2]  Eggleston testified that this was a drug call, and that in some cases involving drugs firearms are also present.

related offenses. The officers saw a newer model red truck occupied by two white males pull in front of Frank's Pool Hall and park on the street. The driver got out and went inside. The officers decided to drive around the block and return to see whether they could observe any drug activity. By the time they had circled the block and had parked near the location of the red truck (about thirty seconds), they saw the driver on his way back to the vehicle.

The truck pulled away and the officers met it at a four-way stop, then followed the truck when it turned. The officers followed the vehicle because they had prior knowledge that Frank's Pool Hall was known for drug activity and the driver's quick entry and exit from the club was consistent with a drug transaction. Investigator Kinney, who was in the back seat, noticed that the truck did not have a working tag light. The officers agreed that there was a tag light violation which gave them probable cause to stop the truck, so they activated their emergency lights to pull the vehicle over.

When the truck pulled into a parking space, Malloy and Kinney got out and began to approach. They saw the passenger door open and watched a white male step out, then saw the extended cab rear door fly open. A black male whom the officers had not previously observed – later identified as the defendant – exited the truck and took off running down the street. Malloy and Kinney pursued on foot, yelling to the defendant that they were police officers and asking him to stop. Just before they reached the next intersection, the defendant turned around and looked at Malloy, then stuck his right hand in his waistband as though he were retrieving something. Malloy thought that defendant might be preparing to throw something on the ground, as there was a big sewage or water containment unit at the

3

intersection.

However, the defendant continued to run across the intersection and Malloy and Kinney continued to pursue. Defendant turned again and reached for his waistband. This time, Malloy saw a black object there and began to be concerned about his safety. Malloy started to unsnap his Taser and pull it out of its holding cartridge as defendant and the officers continued to run. Defendant turned around for a third time, and began to pull the black object out of his waistband. Malloy testified that at that point he thought his life was in danger, and he fired his Taser, saw defendant "lock up" and begin to fall down, and watched a revolver fall to the ground. Malloy told defendant to turn on his stomach and put his hands behind his back. However, defendant began to get up instead, so Malloy hit him with another five-second burst of the Taser. Officers placed defendant in custody and retrieved a fully loaded .38 caliber revolver from the ground nearby.

3.    <u>November 23, 2005 incident</u>

On November 23, 2005, Dothan police officer Will Thompson was on patrol at about 12:50 a.m. when he heard on the radio that officers were looking for a four-door Acura Legend. As Thompson started southbound on Gilda Street to try to locate the Acura, a Chevy Cavalier got in front of him, traveling in the same direction. The Cavalier approached a T-intersection and turned left without slowing down, running the stop sign at the intersection. The car accelerated noticeably as it traveled eastbound on Webb Road, and Thompson followed, activating his emergency equipment to make a traffic stop. However, the Cavalier did not stop but, instead, ran a second stop sign at the next intersection.

4

Thompson called for assistance.

As the Cavalier reached the entrance to a housing development, the driver's side door opened while the car was still moving at five to 10 miles per hour. Thompson could see an arm and a leg (the arm in a green and brown or tan checked flannel shirt or jacket and the leg in blue jeans) coming out of the Cavalier as though the defendant were getting ready to bail out of the car and run. However, the driver instead shut the door and sped up, driving at an average speed of 40-50 miles per hour in a 30 mile per hour zone. The Cavalier turned right, traveled six or seven blocks, and then turned left, still exceeding the speed limit. The car came to a stop long enough for a man later identified as the defendant to jump out and run northbound through some houses. The Cavalier, which had not been placed in park, left the roadway and came to a halt just in front of a telephone pole.

Thompson pursued the defendant on foot. The defendant ran into the back yards of two abandoned houses, and Thompson lost sight of him. Another patrol car pulled up with its emergency lights and sirens on. Thompson and other officers searched the area for five or six minutes until Thompson came upon the defendant, who was wearing blue jeans and had a flannel jacket next to him, lying in the underbrush with his head down near a chain link fence. Thompson told defendant not to move and radioed the other officers that he had the suspect. Defendant got up on his hands and knees as if he were going to flee, so Thompson fired his Taser. The Taser did not seem to have its normal effect, and defendant was able to turn and look at Thompson. Thompson reholstered his Taser and grabbed the defendant by the forearm, and the two struggled until Thompson got the defendant handcuffed.

Another officer picked up the flannel jacket, which had been lying about an arm's length from the defendant, and a firearm in a brown holster fell out. The firearm was later identified as a stolen weapon. According to the police report, defendant was charged with resisting arrest and giving a false name to law enforcement, in addition to receiving a number of traffic citations. Later, defendant made a statement admitting, *inter alia*, that he possessed a .38 special during the incident.

## Discussion

Defendant characterizes each of his encounters with police in this case as <u>Terry</u> stops, see <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and he maintains that none of the stops and seizures were constitutional. Specifically, he argues that:

> [With regard to the first arrest May 9, 2005, officers] got a *tip* from some unidentified, unknown person of unknown origin, of unknown reliability and used that to stop Mr. Stephens. They saw nothing wrong when they approached him but using that *tip* leveraged their encounter to the point they seized Mr. Stephens person and found a gun near him. Good hunches do not meet constitutional muster.
>
> The same is true for the August 6, 2005, seizure. The officers saw a red truck parked outside a pool hall with two white men. They left, saw a similar truck driving past them and stopped it. Mr. Stephens ran off, was seized and a hand gun found near him. He was subsequently questioned and made several statements.[3]
>
> The arresting officers had no probable cause under any circumstances to stop the truck. The initial report said that they even left the scene and the truck had left too. Two days later, there is a supplement report saying the reason this 2nd

---

[3] The police report for this incident discloses no statements by defendant, and the evidence presented at the suppression hearing indicated that police did not take any statement from defendant after this stop because the defendant "was under the influence of something."

truck was stopped was because its *tag light was out.* Again we have officers
with a hunch which is not enough.

Finally on November 23, 2005, the officers claim a vehicle being driven by
someone, ran a stop sign early, early in the morning. The driver leaves the
vehicle and after some time, find Mr. Stephens. There was no running of the
stop sign. That is the excuse used to stop the car. Mr. Stephens is found near
the scene with a gun near him, but not in his possession. The officers did not
have probable cause to stop the vehicle nor seize Mr. Stephens. He can lie in
the woods all he wants, that is not yet a crime.

Motion to Suppress at 4. After a careful review of each of defendant's encounters with

police officers, the court concludes that defendant's arguments are without merit.

1.     May 9, 2005 incident

During the May 9, 2005, incident, police officers were dispatched to investigate

reported drug activity near a store. There, they found defendant in the passenger side of a

parked vehicle that generally matched the description of the SUV reported. No traffic stop

or investigative detention had occurred at the time that officers approached the vehicle.

Thus, even assuming arguendo that officers lacked "reasonable suspicion" at that point that

criminal activity was afoot, the officers were entitled to approach the defendant and speak

to him. See United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) ("'[N]ot every

encounter between a police officer and a citizen is an intrusion requiring an objective

justification.'") (citing United States v. Mendenhall, 446 U.S. 544 (1980)(opinion of Stewart

J.)); see also Franklin, 323 F. 3d at 1301 ("'There is nothing in the Constitution which

prevents a policeman from addressing questions to anyone on the streets.'")(citation omitted).

Thereafter, Officer Eggleston's concerns abut criminal activity clearly ripened into

reasonable suspicion. That suspicion began with the report of narcotics sales relayed by city dispatch,[4] and the fact that the officers discovered a vehicle that matched the description of the SUV at the location referenced in that report. In addition, Eggleston thought that he heard the doors lock as he approached the car, and saw defendant's left hand "fidgeting or moving around" the center console. He was aware that guns often accompany drug activity. When the officers asked the defendant to step out of the car for their own (and the defendant's) safety, defendant did not get out. He then declined to move his hand away from his left side near the console when he was asked to do so. At this point, when Eggleston reached across and grabbed the defendant's left forearm – an action which constituted a seizure under the Fourth Amendment, see Franklin, 323 F.3d at 1301 – he did not have merely an inchoate and unparticularized suspicion or hunch of criminal activity, but instead possessed at least a minimal level of objective justification for making the seizure. See United States v. Gordon, 231 F.3d 750, 754 (11th Cir. 2000) (Discussing the standard for reasonable suspicion).

Further, Eggleston was entitled to secure the suspected weapon that he heard drop when he pulled up the defendant's hand. There is "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason

---

[4] Anonymous tips corroborated by independent police work – that is, in this case, the confirmation by officers that the vehicle was present as described in the report, and the fact that defendant failed to respond as directed to reasonable requests made for officer safety – can be reliable enough to provide reasonable suspicion to make investigatory Terry stops. United States v. Gibson, 64 F.3d 617, 620 (11th Cir. 1995); see also United States v. Roper, 702 F.2d 984, 989 (11th Cir. 1983).

to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 26; see also United States v. Acosta, 363 F.3d 1141, 1146 (11th Cir. 2004) ("The Supreme Court has stated that officers may take reasonable steps to ensure their safety so long as they possess 'an articulable and objectively reasonable belief that the suspect is potentially dangerous.'"); United States. v. Gibson, 64 F.3d 617, 623-24 (11th Cir. 1995) (A law enforcement officer, during the course of an investigatory stop, may conduct a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual.); Roper, 702 F.2d at 987 (11th Cir. 1983) ("To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of Terry v. Ohio ...."). Under the circumstances of this case, the court finds that Eggleston was reasonably warranted in the belief that his safety or that of others was in danger.

Finally, defendant's statement that the gun was his and he was scared so he dropped it is not due to be suppressed. Although defendant's motion did not seek suppression of the statement on the ground that police failed to advise him of his Miranda rights, counsel did elicit testimony at the suppression hearing that no warning was given prior to the statement. However, police are not generally required to give Miranda warnings during ordinary Terry stops. See Pennsylvania v. Bruder, 488 U.S. 9, 10 (1988) (Persons temporarily detained

9

pursuant to such stops are not "in custody" for the purposes of <u>Miranda</u>.). Further, to the extent that defendant had been placed in custody before making the statement at issue, it is clear that police did not actively question the defendant to elicit his statement. "Voluntary and spontaneous comments by an accused, even after <u>Miranda</u> rights are asserted, are admissible evidence if the comments were not made in response to government questioning." <u>Cannady v. Dugger</u>, 931 F.2d 752, 754 (11th Cir.1991); <u>see also</u> <u>United States v. Johnson</u>, 136 Fed.Appx. 279, 283 (11th Cir. 2005). Absent evidence that defendant's statement was the product of interrogation, the statement is not due to be suppressed. <u>See</u> <u>United States v. Washington</u>, 431 U.S. 181, 187 (1977) ("Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. ... Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.").

2.    <u>August 5-6, 2005 incident</u>

With regard to defendant's August 5-6, 2005 encounter with police, defendant contends that officers did not have probable cause to stop the truck from which defendant fled during the traffic stop.[5] The court cannot agree.

The constitutionality of the traffic stop in this case is analyzed under <u>Terry v. Ohio</u>,

---

[5] The court notes that even though defendant was not the driver of the truck, defendant's flight from the vehicle after it was stopped clearly supported officers' reasonable suspicion that he himself was engaged in criminal activity. "While flight is not proof of wrongdoing, it is indicative of such. ... Innocent persons might run from police officers; but flight creates an ambiguity; and the officers may stop the person to resolve the ambiguity." <u>United States v. Franklin</u>, 323 F.3d 1298, 1302 (11th Cir. 2003).

392 U.S. 1 (1968).  Pursuant to Terry, "[l]aw enforcement officers may briefly detain a person for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity." United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993).  "The Terry rationale allows police to stop a moving car based on a reasonable suspicion that its occupants are violating the law."  Diaz-Lizaraza, 981 F.2d at 1220.  "The reasonable suspicion required for a Terry stop is more than a hunch, at least 'some minimal level of objective justification,' taken from the totality of the circumstances."  Id. at 1220-21 (citation omitted).

In this case, Officer Malloy testified, and the court finds, that Investigator Kinney, who was in the back seat of the officers' unmarked Blazer, noticed that the truck in question did not have a working tag light.  Investigator Parrish, who was also a passenger in the Blazer, confirmed that view.  The officers believed that the tag light violation gave them probable cause to stop the truck.  No evidence before the court suggests that the tag light in question was, in fact, operational.  Thus, the stop of the vehicle was lawful.  See United States. v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) ("[A] decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation occurred."); Ala. Code § 40-12-258(d) (Requiring a license plate to be lighted by a license plate lamp).

Further, even if the stop were "pretextual," as the officers were admittedly suspicious that the occupants of the truck were engaged in drug activity, the Supreme Court and the Eleventh Circuit have determined that "ulterior motives will not invalidate police conduct

based on probable cause to believe a violation of the law occurred." Draper v. Reynolds, 369

F.3d 1270, 1275 (11th Cir. 2004); see also Whren v. United States, 517 U.S. 806,

812-13(1996); United States v. Holloman, 113 F.3d 192, 194 (11th Cir.1997).   As the

Eleventh Circuit has noted, "under Whren, the constitutional reasonableness of a traffic stop

must be determined irrespective of intent, whether of the particular officer involved or of the

theoretical reasonable officer."   Id. (internal quotation marks and citation omitted).   Thus,

so long as the officers possessed probable cause to believe that the truck committed a traffic

violation, the stop complied with the Fourth Amendment regardless of any desire the officers

had to intercept drugs.   Id.

3.    November 23, 2005 incident

Defendant contends that police did not have probable cause to stop his Chevy Cavalier

or to arrest him on November 23, 2005.   However, the court credits Officer Thompson's

testimony that defendant ran two stop signs during the chase, exceeded the speed limit, and

failed to stop when Thompson sought to pull him over.   Thus, Thompson had ample probable

cause to stop defendant's vehicle.   He also had probable cause to arrest the defendant as, at

the moment that the arrest was made, the facts and circumstances within the officers'

knowledge and of which they had reasonably trustworthy information were sufficient to

warrant a prudent man in believing that the defendant had committed or was committing an

offense.   See Beck v. Ohio, 379 U.S. 89, 91 (1964); see also United States v. Gonzalez, 71

F.3d 819, 826 (11th Cir. 1996) (Officers had probable cause to arrest where defendant

attempted to flee rather than submit to the officers' lawful show of authority, engaging the

officers in a reckless chase); <u>Ala. Code</u> §§ 32-5A-193(b) (attempting to elude), 13A-10-41(resisting arrest).

### Conclusion

Accordingly, for the foregoing reasons, it is the Recommendation of the Magistrate Judge that defendant's motion to suppress (Doc. # 16) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before close of business May 17, 2006.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 4th day of May, 2006.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE